# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
Filed: November 1, 2021

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | | |
| PATRICIA HOOVER, on behalf of | * | |
| her minor child, L.H., | * | PUBLISHED |
| | * | |
| Petitioner, | * | No. 20-1394V |
| | * | |
| v. | * | Special Master Nora Beth Dorsey |
| | * | |
| SECRETARY OF HEALTH | * | Attorneys' Fees and Costs; Reasonable |
| AND HUMAN SERVICES, | * | Basis; Good Faith. |
| | * | |
| Respondent. | * | |
| | * | |
| * * * * * * * * * * * * * * | | |

Andrew D. Downing, Van Cott & Talamante, PLLC, Phoenix, AZ, for petitioner.
Jeremy F. Fugate, U.S. Department of Justice, Washington, DC, for respondent.

**DECISION ON ATTORNEYS' FEES AND COSTS**[1]

On October 14, 2020, Patricia Hoover on behalf of her minor child, L.H., ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2012)[2] alleging that L.H. developed movement disorder, brain fog, sleep disruption, and back pain following the administration of human papillomavirus ("HPV") vaccines on November 6, 2017 and May 21, 2018. Petition at 1 (ECF No. 1). On July 6, 2021, petitioner filed a Notice of Intent to Withdraw Petition, and on July 8, 2021, the undersigned issued an Order Concluding Proceedings Pursuant

---

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).  **This means the Decision will be available to anyone with access to the Internet.**  In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2012).  All citations in this Decision to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

1

to Vaccine Rule 10(d).  Notice of Intent to Withdraw Petition, filed July 6, 2021 (ECF No. 23); Order Concluding Proceedings dated July 8, 2021 (ECF No. 24).

On July 9, 2021, petitioner filed an application for attorneys' fees and costs.  Petitioner's Application for Attorneys' Fees and Costs ("Pet. Mot."), filed July 9, 2021 (ECF No. 26).  Respondent opposed an award of fees and costs based on lack of reasonable basis and good faith.  Respondent's Response to Pet. Mot. ("Resp. Response"), filed July 15, 2021 (ECF No. 27).

For the reasons discussed below, the undersigned **GRANTS IN PART** petitioner's motion and awards $17,089.42 in attorneys' fees and costs.

## I.  BACKGROUND

### A.  Procedural History

Petitioner filed her petition on October 14, 2020 and filed medical records in October, November, and December 2020.  Petition; Petitioner's Exhibits ("Pet. Exs.") 1-12.  Petitioner filed a Statement of Completion on December 7, 2020 and on January 19, 2021, the case was assigned to the undersigned.  Statement of Completion, filed Dec. 7, 2020 (ECF No. 12); Notice of Reassignment dated Jan. 19, 2021 (ECF No. 14).

Respondent filed respondent's Rule 4(c) Report on April 22, 2021, arguing against compensation.  Resp. Report ("Rept."), filed Apr. 22, 2021 (ECF No. 19).  Petitioner was then ordered to file additional medical records and an expert report.  Order dated Apr. 23, 2021 (ECF No. 22).  On June 11, 2021, the undersigned issued the statutory 240-day notice and on July 6, 2021, petitioner filed a Notice of Intent to Withdraw Petition.  240-Day Order dated June 11, 2021 (ECF No. 21); Notice of Intent to Withdraw Petition.  The undersigned issued an Order Concluding Proceedings Pursuant to Vaccine Rule 10(d) on July 8, 2021.  Order Concluding Proceedings.

On July 9, 2021, petitioner filed an application for attorneys' fees and costs.  Pet. Mot.  Respondent filed a response to petitioner's motion opposing an award of fees and costs based on lack of reasonable basis and good faith on July 15, 2021.  Resp. Response.  Petitioner filed a reply on July 19, 2021 and a motion to supplement attorneys' fees on July 21, 2021.  Pet. Reply to Resp. Response ("Pet. Reply"), filed July 19, 2021 (ECF No. 28); Pet. Mot. to Supplement Attorneys' Fees, filed July 21, 2021 (ECF No. 29).

This matter is now ripe for adjudication.

### B.  Abbreviated Summary of Medical Records[3]

L.H. was 14 years old when she received her first dose of the HPV vaccine on November 6, 2017.  Pet. Ex. 2 at 8.  L.H.'s past medical history was significant for anxiety and depression.  Id. at 3.

---

[3] Although the undersigned has reviewed all of the medical records and other evidence in this case, for purposes of efficiency, this history is largely taken from respondent's Rule 4(c) Report.  For a more detailed factual history, see Resp. Rept. at 1-13.

2

On December 11, 2017, L.H. saw orthopedist, Dr. Richard Cirillo, for intermittent knee pain. Pet. Ex. 2 at 9. An X-ray showed bilateral tilt but was otherwise normal. Id. L.H.'s physical examination revealed pain radiating from her buttock to her left thigh and knee when her knee was extended. Id. at 9-10. L.H. was assessed with left knee pain, which was noted to be present since August 2017. Id. at 9. L.H. was referred to physical therapy ("PT") and X-rays of the lumbar spine and hip were ordered. Id.

On May 21, 2018, L.H. received her second HPV vaccination. Pet. Ex. 2 at 11. During that visit, L.H. was diagnosed with dysmenorrhea and hypermenorrhea and referred to a pediatric gynecologist. Id.

L.H. presented to gynecologist, Dr. Veronica Gomez-Lobo, on June 4, 2018 for heavy menses and dysmenorrhea. Pet. Ex. 7 at 39. Dr. Gomez-Lobo diagnosed L.H. with dysmenorrhea and prescribed an oral contraceptive. Id.

On September 1, 2018, L.H. went to the emergency department ("ED") after experiencing a fall, with a chief complaint of twitching. Pet. Ex. 4 at 3-4. L.H. was noted to have "had very little sleep over the past several days. She states last night she had about 4 hours of sleep. . . . She states she felt very weak, collapsed [two] times when walking. . . . She states when she was able to sleep in the car, her mother noted that she was twitching." Id. at 9. L.H. also stated she felt nauseous. Id. L.H.'s physical exam and lab work were normal, and she was diagnosed with exhaustion and fatigue and discharged home. Id. at 10-11.

On April 10, 2019, L.H. again presented to the ED and saw Dr. Marion Colburn for lower back pain. Pet. Ex. 3 at 79. She reported constant aching lower back pain and mild mid-line back pain for the past week, and that standing up after sitting for a long time increased her pain. Id. Her pain was exacerbated by horseback riding. Id. X-rays of the lumbar and thoracic spine showed no gross displaced fracture of the thoracic/lumbar spine, mild curvature of the thoracic spine, and normal lordosis. Id. at 81. Dr. Colburn felt that L.H.'s pain was "likely related to injury from horseback riding. [L.H.] should avoid horseback riding until pain resolves." Id. L.H. was discharged with diagnoses of strain of the lumbar and thoracic spine and scoliosis, and was told to avoid horseback riding until all pain resolves. Id. at 81-82.

On April 15, 2019, L.H. returned to see Dr. Cirillo for lumbar pain. Pet. Ex. 6 at 15. L.H. reported that she had been experiencing lower back pain for the past two months and that her symptoms flared with standing and horseback riding. Id. Her exam was normal, and she was subsequently diagnosed with acute bilateral low back pain without sciatica. Id. at 17.

L.H. had a follow up visit with her pediatrics office for night twitches and sleepwalking on July 12, 2019. Pet. Ex. 2 at 17. L.H. was diagnosed with sleepwalking and was referred to a sleep specialist. Id.

L.H. was transported to the ED via ambulance on August 10, 2019, after experiencing full body spasms while working at the water park. Pet. Ex. 3 at 16, 32. L.H.'s computed tomography ("CT") scan, electrocardiogram ("EKG"), and labs were unremarkable. Id. at 27, 31-32. L.H. was discharged on the same day and scheduled for a neurology evaluation. Id. at 28, 32-33.

On August 12, 2019, L.H. met with neurologist Dr. Carl Stafstrom due to episodes of uncontrollable jerking. Pet. Ex. 2 at 18. L.H. reported she experienced her first isolated episode of twitching in August 2018, and the twitching episodes increased from one per week in April of 2019, to one or more a day by August 2019. Id. Dr. Stafstrom noted that the "episodes don't last longer than 5 minutes and that she can converse and speak during them. The episodes occur almost exclusively in the setting of sleep, and often wake her up from her sleep, with the exception of 2 episodes that have occurred during the day." Id. "She denie[d] any post-ictal symptoms (paralysis, confusion, sleepiness). She is able to suppress the shaking on command." Id. L.H. denied other neurologic changes, including facial movements, tongue fasciculations or twitching, strength or sensation concerns, gait changes, memory or cognitive changes, or headaches. Id. L.H. stated that she had been experiencing significant stress since April of 2019. Id. She also reported that she was seeing a sleep therapist and that the results of a sleep study were pending. Id. On exam, L.H.'s neurological exam and EKG were normal, and her electroencephalogram ("EEG") was normal with no signs of seizure. Id. at 16-19. Dr. Stafstrom stated the mostly like etiology was a functional neurologic disorder, and stated that L.H. should work to reduce stress and continue seeing her sleep therapist. Id. at 19.

On August 14, 2019, L.H. underwent a sleep study. Pet. Ex. 2 at 22. The polysomnography report stated that L.H. had poor sleep efficiency with no seizure activity, no abnormal movements, and stated that her sleep architecture was significant for alpha intrusion and a low percentage of rapid eye movement. Id.

L.H. met with neurologist Dr. Bennett Lavenstein on October 3, 2019 with a chief complaint of involuntary movement or possible seizures. Pet. Ex. 7 at 11. Dr. Lavenstein noted a concern that L.H. may have latent myoclonic epilepsy and scheduled a 72-hour EEG to be performed from November 8, 2019 to November 11, 2019. Id.[4]

On January 29, 2020, petitioner had a neurosurgery consultation with Dr. Jean-Marc Voyadzis for lumbar pain. Pet. Ex. 10 at 2. Dr. Voyadzis noted that L.H. had a history of unusual abnormal muscle movements of her entire body at night with no obvious diagnosis, that she had a two-year history of lumbosacral pain, and that she was currently in therapy for severe anxiety. Id. Dr. Voyadzis reviewed L.H.'s MRI and assessed that L.H. had a left-sided disc protrusion and some displacement of the left S1 nerve root. Id. at 4. They discussed surgery. Id.

On May 18, 2020, L.H. had a well exam and pre-operative visit for a left L5 S1 discectomy for lumbar stenosis with a bulging disc and sciatica. Pet. Ex. 2 at 25. At this visit, it was noted that she slept well most days and had been undergoing counseling for depressive symptoms since September 2019. Id. After an evaluation, L.H. was cleared for surgery. Id.

### C.     Other Evidence

Petitioner filed a Statement averring that soon after L.H.'s second HPV vaccination on May 21, 2018, L.H. began to experience tremors that usually occurred at night, and occasionally during the morning or daytime. Pet. Ex. 1 at ¶¶ 5-6. Prior to vaccination, L.H. had no known illnesses. Id. at ¶ 3. Petitioner stated on September 1, 2018, L.H. had fallen twice and was twitching in the car on the way to the ER. Id. at ¶ 6. The movement disorder got increasingly worse by spring and summer of 2019. Id. at ¶ 7. At that point, L.H. had seen three different

---

[4] Records regarding L.H.'s 72-hour EEG were not filed.

neurologists, two of whom ruled out epilepsy. Id.  L.H. has since become very forgetful, suffers from fatigue, and developed irregular menses. Id. at ¶ 9.

Petitioner also filed the Gardasil, HPV vaccine, package insert. Pet. Ex. 9. Under warning and precautions, the insert states, "vaccinees may develop syncope, sometimes resulting in falling with injury . . . sometimes associated with tonic-clonic movements and other seizure-like activity." Id. at 1. Seizures, malaise, myalgia, nausea, and fatigue were also reported during postmarketing surveillance. Id. at 7, 10.

## II.     PARTIES' CONTENTIONS

### A.     Petitioner's Contentions

Petitioner maintains her complaint was brought in good faith and with reasonable basis, pursuant to the statutory requirements for the filing of vaccine related claims in the Vaccine Program. Pet. Mot. at 1. Petitioner believes the HPV vaccine injured L.H. and opts to bring a suit directly against Merck, instead of going through the Program. Id. at 2-3. Petitioner filed an affidavit attesting to her belief the HPV vaccine harmed her daughter and ultimately filed a Vaccine Adverse Event Reporting System ("VAERS") report. Id. Additionally, petitioner states that after L.H.'s second HPV vaccination, she began to experience tremors and reported fatigue, nausea, myalgia, and light-headedness. Id. at 4. Petitioner identifies that the symptoms that occurred are also symptoms listed in the vaccine package insert that has been determined by the manufacturer to be "a symptom 'for which there is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event.'" Id. The Federal Circuit has indicated that product inserts may provide probative evidence supporting reasonable basis. Cottingham v. Sec'y of Health & Hum. Servs., 971 F.3d 1337 (Fed. Cir. 2020); James-Cornelius v. Sec'y of Health & Hum. Servs., 984 F.3d 1374 (Fed. Cir. 2021).

### B.     Respondent's Contentions

Respondent argued that petitioner is not entitled to attorneys' fees and costs because "petitioner lacks a reasonable basis for her claim and did not file or maintain the claim in good faith." Resp. Response at 1. Regarding good faith, respondent emphasized the legislative intent behind the Vaccine Act of "divert[ing] litigation over alleged vaccine injuries away from vaccine manufacturers" and having the Vaccine Program "serve as the primary vehicle for resolving vaccine injury claims" in order to "help ensure a robust supply of vaccines." Id. at 11. Respondent contends that the fact that petitioner filed this petition only to comply with the statutory prerequisite to bringing a direct action against the vaccine manufacturer is incompatible with a good faith filing. Id. Specifically, respondent asserted the "petition was brought solely to satisfy the statutory requirement to come through the Program, so that petitioner could exit the Program and bring a civil suit against Merck." Id. In a review of petitioner's counsel's billing records, respondent stated petitioner's counsel made no effort to comply with the undersigned's request to file an expert report and "ignored the court's deadline in order to run out the clock as it pertains to the statutory period, so that she could withdraw from the Program without receiving a decision or judgment." Id. at 12.

Regarding reasonable basis, respondent stated "petitioner has not presented a medical theory causally linking L.H.'s HPV vaccinations to the alleged injuries . . . and/or conditions and has not presented a logical sequence of cause and effect showing that L.H.'s vaccinations were

the reason for her alleged injuries and/or conditions." Resp. Response at 14. "Additionally, petitioner has not offered any evidence to establish that the onset of L.H.'s alleged vaccine injuries occurred in a timeframe within which vaccine causation could be ascribed. L.H. received her HPV vaccinations on November 6, 2017 and May 21, 2018, but she did not have her first episode of twitching until over 103 days later, on September 1, 2018." Id.

In closing, respondent stressed the potential strain on this Program if other petitioners follow a similar approach:

> Congress's inclusion of the objective reasonable basis requirement in Section 15(e) of the Act evinces its intent to encourage petitioners' attorneys to perform fundamental due diligence, and pursue claims that have some basis in fact, science, and law. Enforcement of this intent has become all the more important in recent years as the Program faces an ever-burgeoning docket with limited resources. Each petition that is filed carries transaction costs for both the Program and the court. With a statutorily-limited number of Special Masters, the time and resources that must be devoted to disposing of cases with no reasonable basis that are brought before the court lacking good faith – cases which petitioner never intended to litigate before the court nor completely develop the record – inevitably reduces the court's ability to focus on meritorious claims, and delays compensation in those cases.

Resp. Response at 15-16.

Finally, respondent noted, "[s]hould the Special Master conclude that an award of attorneys' fees is appropriate, then respondent respectfully requests that the Special Master exercise h[er] discretion and determine a reasonable award for attorneys' fees and costs." Resp. Response at 16 n.1.

### III. DISCUSSION

In establishing a system for compensation of vaccine-related injuries the Vaccine Act provides that "[t]he United States Court of Federal Claim and the United States Court of Federal Claims special masters shall, in accordance with this section, have jurisdiction over proceedings to determine if a petitioner under section 300aa-11 of this title is entitled to compensation under the Program and the amount of such compensation." § 12(a). The Vaccine Act was intended to facilitate compensation by providing "fast, informal adjudication" of no-fault injury claims within the office of special masters in lieu of traditional tort suits against vaccine manufacturers. Bruesewitz v. Wyeth LLC, 562 U.S. 223, 228 (2011). The "*quid pro quo*" for this no-fault program, "designed to stabilize the vaccine market, was the provision of significant tort-liability protection for vaccine manufacturers." Id. at 229. Accordingly, the Vaccine Act allows only limited avenues for exiting the Program in order to pursue civil actions against manufactures. Pursuant to the Act, a petitioner must file a petition in the Court of Federal Claims and reject the resulting judgment as a prerequisite to seeking other available tort relief. Id. at 228; see also §§ 11(2)(A)(i), 21(a).

Section 12(d)(3)(A)(ii) of the Vaccine Act provides that "[a] special master to whom a petition has been assigned shall issue a decision . . . as expeditiously as practicable but not later than 240 days… after the date the petition was filed." Given current caseloads, resolution of a

6

claim within 240 days is very rare apart from facially defective petitions (i.e. non-covered vaccine).  Section 12(g) states that if the special master fails to make a decision on the petition within the prescribed timeframe, the special master shall "notify the petitioner . . . that [they] may withdraw the petition under section 300aa-21(b)."

With regard to bringing an action against a vaccine manufacture, § 11(a)(2)(A)(ii) of the Vaccine Act provides that,

> No person may bring a civil action for damages in an amount greater than $1,000 or in an unspecified amount against a vaccine administrator or manufacturer in a State or Federal court for damages arising from a vaccine-related injury or death . . . unless a petition has been filed, in accordance with section 300aa-16 of this title, for compensation under the Program for such injury or death and . . . such person elects to withdraw such petition under section 300aa-21(b) of this title or such petition is considered withdrawn under such section.

Here, petitioner exited the Program pursuant to section 21(b) with the stated intention of filing a lawsuit against the vaccine manufacturer.  The question presented by this motion is whether attorneys' fees and costs may be paid to a petitioner who exits the Program in this manner.

To achieve the outcome petitioner sought, Vaccine Rule 10(d) comes into play.  Rule 10(d) states that the special master's order concluding proceedings in response to petitioner's notice of withdrawal "upon entry will be deemed a judgment for purposes of 42 U.S.C. § 300aa-15(e)(1)."

Further, § 15(e)(1) of the Vaccine Act provides that "[i]f the judgment of the United States Court of Federal Claims on such a petition does not award compensation, the special master or court may award an amount of compensation to cover petitioner's reasonable attorneys' fees and other costs incurred in any proceeding on such petition if the special master or court determines that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought."

Vaccine Rule 10(d) and § 15 of the Vaccine Act operate in tandem so that the undersigned's order concluding proceedings results in a judgment on the petition that does not award compensation.  Thus, a straightforward application of the Vaccine Act and the Vaccine Rules permits reasonable attorneys' fees and costs upon a showing that the petition was brought in good faith and with a reasonable basis.

"Good faith" is a subjective standard.  Hamrick v. Sec'y of Health & Hum. Servs., No. 99-683V, 2007 WL 4793152, at *3 (Fed. Cl. Spec. Mstr. Nov. 19, 2007).  A petitioner acts in "good faith" if he or she holds an honest belief that a vaccine injury occurred.  Turner v. Sec'y of Health & Hum. Servs., No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007).  The standard for finding good faith has been described as "very low," and findings that a petition lacked good faith are rare.  Heath v. Sec'y of Health & Hum. Servs., No. 08-86V, 2011 WL 4433646, at *2 (Fed. Cl. Spec. Mstr. Aug. 25, 2011).

"Reasonable basis," however, is an objective standard.  Unlike the good faith inquiry, reasonable basis requires more than just petitioner's belief in her claim.  See Turner, 2007 WL

4410030, at *6.  Instead, a reasonable basis analysis "may include an examination of a number of objective factors, such as the factual basis of the claim, the medical and scientific support for the claim, the novelty of the vaccine, and the novelty of the theory of causation."  Amankwaa v. Sec'y of Health & Hum. Servs., 138 Fed. Cl. 282, 289 (2018); accord Cottingham, 971 F.3d 1337.  "More than a mere scintilla but less than a preponderance of proof could provide sufficient grounds for a special master to find reasonable basis."  Cottingham, 917 F.3d at 1346.

IV.   ANALYSIS

   A.   Good Faith

The undersigned agrees with respondent that one of the purposes of the Vaccine Act is to divert vaccine litigation into the Program.  However, the undersigned disagrees that petitioner's actions run afoul of the Act.  Respondent has failed to explain how the legislative history of the Vaccine Act supersedes the express language of the Act which allows petitioner to do what she has done in this case.  Section 11(2)(A)(ii) of the Act allows a petitioner to pursue a civil action after withdrawing the petition at 240 days.  It appears that the petitioner here has complied with the Act.

Further, respondent cites no authority for his interpretation of "good faith" as encompassing an intention to litigate the claim to completion within the Program.  Pet. Reply at 4.  Petitioner reasonably argues that the meaning of the good faith requirement is well-settled and refers to her belief that the vaccine caused injury to her daughter—and not her intentions regarding the manner of litigation.  Id. at 6 (citing Di Roma v. Sec'y of Health & Hum. Servs., No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993)).  Petitioner's intention to file a lawsuit against the vaccine manufacturer in a different forum is consistent with her belief that a vaccine-caused injury has occurred.

For these reasons, the undersigned finds that this petition was filed in good faith.

   B.   Reasonable Basis

In discussing the reasonable basis requirement in Cottingham (which involved similar allegations relating to the HPV vaccine), the Federal Circuit stressed the prima facie petition requirements of § 11(c)(1) of the Act.  971 F.3d at 1345-46.  Specifically, the petition must be accompanied by an affidavit and supporting documentation showing that the vaccinee:

   (1) received a vaccine listed on the Vaccine Injury Table;

   (2) received the vaccination in the United States, or under certain stated circumstances outside of the United States;

   (3) sustained (or had significantly aggravated) an injury as set forth in the Vaccine Injury Table (42 C.F.R. § 100.3(e)) or that was caused by the vaccine;

   (4) experienced the residual effects of the injury for more than six months, died, or required an in-patient hospitalization with surgical intervention; and

(5) has not previously collected an award or settlement of a civil action for damages for the same injury.

Id.

Consistent with the above, petitioner has filed contemporaneous and facially trustworthy medical records demonstrating: (1) that L.H. received a covered vaccine; (2) that the vaccine was administered in the United States.; (3) that L.H. experienced the symptoms petitioner alleges to constitute a vaccine-caused injury, including developing movement disorder, brain fog, sleep disruption, and back pain; and (4) that these symptoms persisted for at least six months. Petitioner has also averred that there has been no award or settlement of a civil action for damages for the same injury. Pet. Ex. 1 at 2.

L.H.'s medical records indicate after her second HPV vaccination on May 21, 2018, she presented to the ED on September 1, 2018 for symptoms of tremors, twitching, falls, nausea, and fatigue. Pet. Ex. 2 at 11; Pet. Ex. 4 at 3-4. L.H. then met with neurologist Dr. Lavenstein on October 3, 2019 for involuntary movements or possible seizures. Pet. Ex. 7 at 11. Dr. Lavenstein noted a concern that L.H. may have latent myoclonic epilepsy. Id. Petitioner also averred that L.H. had no known illnesses prior to the HPV vaccinations. Pet. Ex. 1 at ¶ 3.

The Gardasil package insert lists "syncope, sometimes resulting in falling with injury . . . sometimes associated with tonic-clonic movements and other seizure-like activity," seizures, malaise, myalgia, nausea, and fatigue as possible adverse reactions of the HPV vaccine. Pet. Ex. 9 at 1, 7, 10. Thus, the medical records suggest that L.H. may have experienced some of the enumerated possible adverse reactions that have been reported as associated with the vaccine.

Additionally, the Federal Circuit has affirmed that "more than a mere scintilla but less than a preponderance of proof could provide sufficient grounds for a special master to find reasonable basis." Cottingham, 971 F.3d at 1346 (finding petitioner submitted objective evidence supporting causation when she submitted medical records and a vaccine package insert); see also James-Cornelius, 984 F.3d at 1380 (finding that "the lack of an express medical opinion on causation did not by itself negate the claim's reasonable basis").

Petitioner's affidavit also attests to L.H. being symptom free prior to the HPV vaccines and "[w]hile lay opinions as to causation or medical diagnosis may be properly characterized as mere 'subjective belief' when the witness is not competent to testify on those subjects, the same is not true for sworn testimony as to facts within the witness's personal knowledge, such as the receipt of a vaccine and the timing and severity of symptoms." James-Cornelius, 984 F.3d at 1380. "Indeed, for many medical symptoms or events—such as a headache and other pain, dizziness, nausea, and vomiting—the patient's or a parent's testimony may be the best, or only, direct evidence of their occurrence." Id.

For these reasons, the undersigned finds that this petition had a reasonable basis when it was filed.

V.  **REASONABLE ATTORNEYS' FEES AND COSTS**

   A.  **Reasonable Attorneys' Fees**

9

The Federal Circuit has approved use of the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act. Avera v. Sec'y of Health & Hum. Servs., 515 F.3d 1343, 1349 (Fed. Cir. 2008). Using the lodestar approach, a court first determines "an initial estimate of a reasonable attorneys' fee by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" Id. at 1347-48 (quoting Blum v. Stenson, 465 U.S. 886, 888 (1984)). Then, the court may make an upward or downward departure from the initial calculation of the fee award based on other specific findings. Id. at 1348.

Counsel must submit fee requests that include contemporaneous and specific billing records indicating the service performed, the number of hours expended on the service, and the name of the person performing the service. See Savin v. Sec'y of Health & Hum. Servs., 85 Fed. Cl. 313, 316-18 (2008). Counsel should not include in their fee requests hours that are "excessive, redundant, or otherwise unnecessary." Saxton v. Sec'y of Health & Hum. Servs., 3 F.3d 1517, 1521 (Fed. Cir. 1993) (quoting Hensley v. Eckerhart, 461 U.S. 424, 434 (1983)). It is "well within the special master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done." Id. at 1522. Furthermore, the special master may reduce a fee request sua sponte, apart from objections raised by respondent and without providing petitioner notice and opportunity to respond. See Sabella v. Sec'y of Health & Hum. Servs., 86 Fed. Cl. 201, 209 (2009). A special master need not engaged in a line-by-line analysis of petitioner's fee application when reducing fees. Broekelschen v. Sec'y of Health & Hum. Servs., 102 Fed. Cl. 719, 729 (2011).

### 1. Hourly Rates

Here, petitioner requests the following hourly rates for the attorneys and paralegals from her firm who worked on this matter:

**Andrew D. Downing – Attorney**
2020-2021: $385.00

**Courtney Van Cott – Attorney**
2020-2021: $275.00

**Robert W. Cain & Danielle P. Avery – Paralegals**
2020-2021: $135.00

The undersigned finds that the requested rates are reasonable and in accordance with what Mr. Downing and Ms. Van Cott have previously been awarded for their Vaccine Program work. See, e.g., Tucker v. Sec'y of Health & Hum. Servs., No. 19-13V, 2020 WL 6777559, at *2 (Fed. Cl. Spec. Mstr. Oct. 30, 2020); Olschansky v. Sec'y of Health & Hum. Servs., No. 17-1096V, 2020 WL 1027681 (Fed. Cl. Spec. Mstr. Feb. 21, 2020). The undersigned will therefore award the rates requested.

Mr. Downing also requested an hourly rate of $135.00 per hour for work done by paralegals from 2020 to 2021. These rates are consistent with such work previously awarded in

the Program.  See Tucker, 2020 WL 6777559, at *2.  Therefore, the undersigned will award the rates requested.

### 2. Reduction of Billable Hours

In reducing an award of fees, the goal is to achieve rough justice, and therefore a special master may take into account their overall sense of a case and may use estimates when reducing an award.  See Florence v. Sec'y of Health & Hum. Servs., No. 15-255V, 2016 WL 6459592, at *5 (Fed. Cl. Spec. Mstr. Oct. 6, 2016) (citing Fox v. Vice, 563 U.S. 826, 838 (2011)).  It is well established that an application for fees and costs must sufficiently detail and explain the time billed so that a special master may determine, from the application and the case file, whether the amount requested is reasonable.  Bell v. Sec'y of Health & Hum. Servs., 18 Cl. Ct. 751, 760 (1989).  Petitioner bears the burden of documenting the fees and costs claimed.

Upon review of the submitted billing records, the undersigned finds the majority of the time billed to be reasonable.  The timesheet entries are sufficiently detailed for an assessment to be made of the entries' reasonableness.  However, a small reduction is necessary due to excessive paralegal time billed.  Paralegals billed time on administrative tasks such as filing documents and handling payments for medical records.  Paralegal time was also excessive for review of filings (e.g., 0.1 hours to review status reports and scheduling orders).  These issues have previously been raised with the Van Cott & Talamante firm.  See Sheridan v. Sec'y of Health & Hum. Servs., No. 17-669V, 2019 WL 948371, at *2-3 (Fed. Cl. Spec. Mstr. Jan. 31, 2019); Moran v. Sec'y of Health & Hum. Servs., No. 16-538V, 2019 WL 1556701, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019).  Therefore, a reasonable reduction of $500.00 is being made for excessive billing for paralegal time.

### B. Reasonable Costs

### 1. Miscellaneous Costs

Petitioner also requests $801.42 for miscellaneous costs, including the filing fee, medical records, and postage charges.  See Pet. Mot., Ex. A at 15, 18-26.  Petitioner has provided adequate documentation supporting these costs and they are reasonable in the undersigned's experience and will be awarded in full.

## VI. CONCLUSION

Based on all of the above, the undersigned finds that it is reasonable to compensate petitioner and his counsel as follows:

**Attorneys' Fees –**

| | |
|---|---|
| Requested Attorneys' Fees: | $ 16,788.00 |
| Reduction of Attorneys' Fees: | - ($ 500.00) |
| Awarded Attorneys' Fees: | $ 16,288.00 |
| | |
| Requested Attorneys' Costs: | $ 801.42 |

| | |
|---|---|
| Awarded Attorneys' Costs: | $ 801.42 |
| **Total Attorneys' Fees and Costs:** | **$ 17,089.42** |

**Accordingly, the undersigned awards:**

**A lump sum in the amount of $17,089.42, representing reimbursement for reasonable interim attorneys' fees and costs, in the form of a check payable jointly to petitioner and petitioner's counsel of record, Mr. Andrew Downing.**

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of Court **SHALL ENTER JUDGMENT** in accordance with this Decision.[5]

**IT IS SO ORDERED.**

s/Nora Beth Dorsey
Nora Beth Dorsey
Special Master

---

[5] Pursuant to Vaccine Rule 11(a), entry of judgment is expedited by the parties' joint filing of notice renouncing the right to seek review.